hAMY, Judge.
The plaintiffs filed suit against the defendant neurosurgeon alleging malpractice due to the failure to diagnose an aneurysm which ruptured with catastrophic consequences. A jury found in favor of the defendant finding no deviation from the applicable standard of care. Following a motion for judgment notwithstanding the verdict, the trial court reversed the jury’s finding and entered judgment in favor of the plaintiff. Both the defendant and the Louisiana Patient’s Compensation Fund appeal seeking reversal of the JNOV. For the following reasons, we reverse the JNOV and reinstate the jury verdict.
Factual and Procedural Background
This medical malpractice suit was filed by the plaintiffs, Janis and Gary Hyatt, following a subarachnoid hemorrhage experienced by Mrs. Hyatt on October 18, 1992. The ruptured aneurysm left Mrs. Hyatt in need of total care without the ability to walk, talk, feed herself, or care for her personal needs. In the petition instituting the matter, the plaintiffs alleged that the defendant, Dr. John Raggio, a neurosurgeon who had examined Mrs. Hyatt following complaints of headaches, failed to properly diagnose or perform proper diagnostic testing prior to the catastrophic rupture. A Medical Review Panel previously convened found that the evidence presented for its review did not support the conclusion that Dr. Raggio failed to comply with the applicable standard of care.
At trial, Mr. Hyatt testified as to his version of the events leading up to October 18, 1992. He explained that Dr. Raggio had treated him for a back problem and that his last visit was on September 14, 1992. He stated that earlier in the year Janis had been experiencing headaches *775 and had a new onset of the headaches on September 14. He testified that on September 23, Mrs. Hyatt experienced a change in the intensity of the headaches and that she walked from the bathroom in their home, grabbed her^head, asked him to turn the lights out, turn off the television, and leave her alone. He did so and Mrs. Hyatt went to sleep.
Mr. Hyatt stated that he called Dr. Rag-gio’s office on September 28, explained that Mrs. Hyatt was having terrible, pounding headaches, that they had intensified that day, and that she was nauseated. He also testified that he told Dr. Raggio that he was frightened because Mrs. Hyatt’s aunt died of an aneurysm. Mr. Hyatt stated that he made an appointment for his wife with Dr. Raggio for September 29. Dr. Raggio testified that he had no recollection of any such phone call and that his records did not indicate that one had occurred. His office records did, however, indicate that an appointment had been scheduled for September 29, but they did not indicate who made the appointment for Mrs. Hyatt or when it was made.
Mr. Hyatt testified that on September 28, one day prior to the scheduled appointment, he telephoned Dr. Raggio again and told him that Mrs. Hyatt was complaining of intense, throbbing pain in her head and that he was taking her to the emergency room. Mr. Hyatt testified that Dr. Raggio stated he would telephone ahead and order x-rays. The record indicates that Mrs. Hyatt was examined at the hospital and that Dr. Raggio ordered a CT scan with and without contrast which was determined to be negative. The emergency room record of that evening reflects the following nurse’s notation:
Headache — onset x2 weeks. Became severe last Wednesday (5 days ago) c/o photophobia, sounds bothering. States movement † pain. Denies blurred vision, tunnel vision. States pain feels like pounding to forehead & top of head. AAO.[1] Speech clear. MAE +/=.[2] No acute distress noted,
¡^(Footnotes added.) After examination, Dr Raggio diagnoSed Mrs. Hyatt’s headache ag lated t t • He or_ dered a shot of Demerol and gave her a prescription for Limbitrol. Mrs. Hyatt was released. She’ did not keep her appointment that was scheduled for the next day with Dr. Raggio. Mr. Hyatt testified that, over the next couple of weeks, Mrs. Hyatt’s condition improved.
Mr. Hyatt testified thaf on the morning of October 18, 1992, he awoke to find the bed shaking and his wife in a tremor. She told him that she felt nauseated. He testified that she then became ill in bed and, grabbing her head, stated that she felt that her head was exploding. Soon thereafter, she collapsed and stopped breathing. Mr. Hyatt testified that he performed CPR while his daughter phoned paramedics. Mrs. Hyatt was taken to the emergency room where Dr. Raggio examined her, ordered an arteriogram, and then diagnosed the ruptured aneurysm.
The record reyeals that Mrs. Hyatt was referred to a hospital in Dallas, Texas where the aneurysm was surgically treated before returning to her home in Louisiana. Mr. Hyatt, testified that she cannot walk, talk, or care for herself. Mrs. Hyatt’s treating physician, Dr. Norman Davidson, testified that she is totally helpless and dependent. He denied that there is any reasonable opportunity that she will recover.
At trial, the plaintiffs argued that Dr. Raggio committed malpractice when he spoke with Mr. Hyatt by phone on September 23 and did not order Mrs. Hyatt to be taken to the emergency room. Further, the plaintiffs asserted that Dr. Raggio breached the applicable standard of care by not ordering a lumbar pune- *776 ture during the September 28 emergency-room visit. They argued that this test was required to rule out the possibility of a subarachnoid hemorrhage. Dr. Raggio contended that Mrs. Hyatt’s history, as related to him, did not indicate that such a condition was present Land did not necessitate a lumbar puncture. Experts testified in favor of each of the parties.
After the jury found in favor of the defendant, the plaintiffs filed a Motion for Judgment Notwithstanding the Verdict And, Alternatively, For a New Trial. This motion was granted by the trial court and, subsequently, a verdict in favor of the plaintiffs was entered on April 23, 1998. The Louisiana Patient’s Compensation Fund (LPCF) intervened pursuant to the Medical Malpractice Act. On November 8, 1998, the trial court entered a judgment awarding damages to the plaintiffs. After both the LPCF and Dr. Raggio filed appeals with this court, the plaintiffs filed motions to dismiss each of the appeals arguing that they were untimely since they were filed following the November 1998 judgment instead of that rendered in April. Originally filed as a writ application, this matter was deferred for consideration along with the substance of the appeals.[3]
In his brief to this court, Dr. Raggio assigns the entry of the JNOV as error contending that the jury’s verdict in his favor was not contrary to the law and evidence. He also argues that the trial judge should have recused himself or set the matter for hearing before another judge. The LPCF appeals arguing that all claims against the LPCF should have been dismissed due to a “secret agreement” entered into prior to trial by Dr. Raggio and the plaintiffs. The LPCF also contends that the court erred in entering the JNOV, in awarding damages, and in entering judgment in favor of an interdicted party when the curator had not been substituted as the plaintiff. The LPCF contends that the appeal taken was timely as there was no “final judgment” until the November 1998 judgment was rendered.
|BThe plaintiffs have answered the appeal and contend that, in the event the jury’s verdict is reinstated, they are entitled to a new trial. They contend that the trial court erred in denying their request to call an expert on rebuttal and in prohibiting Mrs. Hyatt from being called as a witness or attending trial.
Discussion
Timeliness of the Appeals
We first address plaintiffs’ contention that both the appeal taken by Dr. Raggio and that taken by the LPCF are untimely. The plaintiffs contend that the judgment granting the motion for JNOV, signed and filed on April 23, 1998, constituted a final judgment from which the defendants should have appealed. They contend that, by waiting to take an appeal from the November 1998 judgment, that which included damages, the defendants lost their appellate right to contest Dr. Raggio’s liability. The plaintiffs further argue that La.Code Civ.P. art. 2085 precludes the defendants from appealing because there were pretrial stipulations regarding some elements of damages in the event liability was found.
La.Code Civ.P. art. 1915 allows a judgment that does not adjudicate all of the issues of a case to be considered a final judgment only in limited circumstances. Article 1915(B) provides as follows:
B. (1) When a court renders a partial judgment or partial summary judgment or sustains an exception in part, as to one or more but less than all of the claims, demands, issues, theories, or parties, whether in an original demand, re-conventional demand, cross-claim, third party claim, or intervention, the judgment shall not constitute a final judg *777 ment unless specifically agreed to by the parties or unless designated as a final judgment by the court after an express determination that there is no just reason for delay.
(2) In the absence of such a determination and designation, any order or decision which adjudicates fewer than all claims or the rights and liabilities of fewer than all the parties, shall not terminate the action as to any of the claims or parties and shall not constitute a final | ¿judgment for the purpose of an immediate appeal. Any such order or decision issued may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.
Finding these requirements unmet in this case, we conclude that the April 1998 judgment was not an appealable, final judgment. The judgment rendered in November 1998 which included the damages apparently agreed to by the parties, resolved all of the remaining issues and, therefore, constituted the only final judgment.'
Further, La. Code Civ.P. art.2085 provides:
An appeal cannot be taken by a party who confessed judgment in the proceedings in the trial court or who voluntarily and unconditionally acquiesced in a judgment rendered against him. Confession of or acquiescence in part of a divisible judgment or in a favorable part of an indivisible judgment does not preclude an appeal as to other parts of such judgment.
Our review of the record does not reveal judicial confessions or acquiescence so as to preclude appeal. Any indication of such an agreement was not filed into the record. In any event, it is clear that the parties intended for the trial court to enter judgment as to the total amount of damages awarded. We deny the plaintiffs’ motion to dismiss.
Motion for JNOV
The defendants contend that the trial court erroneously granted the motion for JNOV and replaced'the jury verdict with its oym. They argue that Mrs. Hyatt’s medical history, as testified to by Dr. Raggio, did not require that Mrs. Hyatt be ordered to the emergency room or that a lumbar puncture be performed to rule out the possibility that her symptoms were due to a subarachnoid hemorrhage. They point to testimony from Dr. Raggio’s experts indicating that the standard of care owed was not breached.
17Article 1811 of the Louisiana Code of Civil Procedure permits the trial court to enter a judgment notwithstanding the verdict. In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991), the Louisiana Supreme Court discussed the guidelines for a trial court’s consideration of the motion. The court stated:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott [v. Hospital Service Dist. No. 1 of St. Charles Parish, 496 So.2d 270 (La.1986)7, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Id. at 832. .Upon review of a JNOV, the appellate court uses the same criteria as *778 that before the trial court. The reviewing court considers whether the record indicates that reasonable men could not arrive at a verdict contrary to the result urged by the moving party. If the court concludes that reasonable men could arrive at a contrary conclusion, the motion for JNOV was erroneously granted. In such an event, the jury verdict must be reinstated. Id.
In the present case, the plaintiffs filed a motion for JNOV following the jury’s conclusion that Dr. Raggio did not deviate from the appropriate standard of care applicable to neurosurgeons.[4] The trial court granted the motion explaining its | reasoning for the JNOV, in part, as follows:
This Court finds that the— no rational trier of fact could have reached the verdict the jury did. I’m not allowed to comment, as you indicated, on the credibility of the witnesses. If I could comment on it, I’d have some very tort [sic] things to say about at least two witnesses who testified for the defense in this case. I find that this is the most serious case of injustice that I’ve seen on the bench in five and a half years. The Motion for JNOV is granted. Liability is found against Dr. Raggio in favor of Mr. and Mrs. Hyatt....
I think that the evidence is overwhelming as to liability in this case. I think that each and every witness testified that the differential diagnosis was made, including the doctor, that there was a 15 percent chance that the cat scan or the CT scan would not have revealed the problem with the hemorrhage and that because the spinal tap wasn’t done and it would have revealed within 99.9 percent of the time the existence of this bleeding or this rupture of the vessel, which resulted in this lady being a vegetable, and a million and a half dollars in medical bills, and God knows how much future medical bills. I think it’s definitely malpractice on the part of the doctor, which resulted in this catastrophe for Mr. and Mrs. Hyatt. I’ll note the defense’s objection to the Court’s ruling in this matter.
Reviewing the evidence presented by the plaintiffs, we note that Mr. Hyatt testified that he phoned Dr. Raggio on September 23 and informed him that Mrs. Hyatt was experiencing terrible, pounding headaches. He also stated that he informed Dr. Raggio that these headaches had intensified, she was nauseated, and that her aunt had died of an aneurysm. Dr. Gary Lustgarten, an expert in neurosurgery, testified that considering these factors testified to by Mr. Hyatt, Dr. Raggio deviated from the standard of care in not ordering Mr. Hyatt to take his wife to the emergency room. Dr. Lustgarten opined that the symptoms as testified to by Mr. Hyatt were indicative of a warning leak, i.e., a small amount of blood leaking into the subarachnoid space. |9He stated that the symptoms of such a leak include a severe and throbbing headache as well as nausea, vomiting, light and sound sensitivity, and neck pain or stiffness. Dr. Lustgarten *779 stated that he believed the information provided by Mr. Hyatt indicated that Mrs. Hyatt was experiencing a hemorrhage on September 23 and that if taken to the emergency room, a CT scan would have been positive and an arteriogram would have detected the problem. He believed that if detected, Mrs. Hyatt would have been an ideal candidate for surgical intervention. Dr. George McCormick, an expert in anatomical and forensic pathology, also testified that the symptoms of September 23, as related by Mr. Hyatt, were indicative of a rupture. He stated that these symptoms should have resulted in a high suspicion of a hemorrhage.
Next, considering the September 28 emergency room visit, the plaintiffs presented extensive expert testimony regarding Dr. Raggio’s alleged inadequate diagnostic testing of Mrs. Hyatt’s condition. Importantly, we note that the plaintiffs’ central contention is that Dr. Raggio deviated from the standard of care in not performing a lumbar puncture. The plaintiffs’ experts testified that Dr. Raggio deviated from the standard of care in that the CT scan performed, which was negative, should have been followed by a lumbar puncture. They testified that if a physician’s differential diagnosis includes the possibility of subarachnoid hemorrhage, both tests are required as the CT scan is not always conclusive. Dr. Lustgarten testified that he believed that the portion of the emergency room record which indicates that Mrs. Hyatt had a two-week history of headaches which “[b]ecame severe last Wednesday” was sufficient wording to require that a hemorrhage be part of the differential diagnosis. He also stated that the only reason a CT scan would have been ordered, as it was by Dr. Rag-gio, was to rule out a subarachnoid hemorrhage and that a negative CT scan, alone, will not rule out the Impossibility. Dr. McCormick and Dr. Norman Davidson, Mrs. Hyatt’s treating physician, agreed that a lumbar puncture was required in the presence of the negative CT scan.
We now turn to the evidence presented by defendant. As stated above, Dr. Rag-gio denied that Mr. Hyatt phoned him on September 23 to complain of Mrs. Hyatt’s headaches. Furthermore,' he testified that his office had .no record of such a phone call. Thus, if the jury found Dr. Raggio more credible in his version of the events of September 23, there was evidence of such a weight to permit a reasonable trier of fact to find that, at least on this date, there was no deviation from- the standard of care as he could not have instructed Mrs. Hyatt to the emergency room without information available.
■Our review of the evidence also indicates that the jury was required to make credibility determinations regarding the events surrounding the September 28 emergency room visit. While Mr. Hyatt testified that he told the defendant that Mrs. Hyatt was experifen'eing a throbbing headache and inquired specifically as to the possibility of an aneurysm, Dr. Raggio testified the history. given indicated that the headaches were of long standing and not the type of sudden and intense headache associated with a hemorrhage. He stated that when he originally received the phone call that Mrs. Hyatt was going to meet him at the emergency room, subarachnoid hemorrhage was a part of his differential diagnosis, but that it was “way down on the list.” He stated that her history was not of a sudden and explosive headache, the type associated with a subarachnoid hemorrhage, but had been progressive. He testified that Mrs. Hyatt denied the headaches were different in nature on direct questioning. He stated that he was never told of the September 23 episode and that she had denied |na dramatic change. Dr. Raggio testified that the CT scan was ordered to rule out an expanding lesion or tumor.
Dr. David Cavanaugh, an expert in neurosurgery and a member of the Medical Review Panel, testified that" the evidence presented does not demonstrate a breach of the standard of care. Dr. Cavanaugh *780 explained that a two week history of headaches, as is contained on the emergency room record, does not provide him with a high suspicion of subarachnoid hemorrhage. He stated that, if Dr. Raggio was told of the September 23 episode, the differential diagnosis would have included a hemorrhage. He agreed that a negative CT scan would not rule out a subarachnoid hemorrhage, but explained that this emergency room record indicated that there was no explosive onset of headaches.
Dr. Chester Babson Fresh, an expert in neurosurgery who also participated as a member of the Medical Review Panel, testified that he believed the defendant acted appropriately. He testified that Dr. Rag-gio took an appropriate history and physical and that a muscle tension headache diagnosis was consistent with the record. He explained that during the course of an examination, a physician’s differential diagnosis may change and that a problem originally included on a doctor’s initial working diagnosis may drop off of the list completely. Dr. Fresh concluded that subarachnoid hemorrhage had dropped off of Dr. Raggio’s list while he was doing the history and physical. Thus, there was no need for the lumbar puncture. Dr. Fresh opined that Dr. Raggio met the standard of care required of neurosurgeons in the situation.
Our review of the evidence as a whole indicates that the jury was required to make several credibility determinations. As stated above, the jury was first required to determine whether Dr. Raggio was informed of the episode on September 23. As |12Pr. Raggio testified that he never received a phone call on that date or that he was told of the episode at Mrs. Hyatt’s home, there was sufficient evidence in the record to conclude that this information was not provided. Furthermore, Dr. Raggio’s testimony indicates that Mrs. Hyatt did not report the type of explosive onset of headaches characteristic of a subarachnoid hemorrhage. Rather, he testified that she reported the same headaches she had been having for a year, only that they had worsened. In addition to the defendant’s experts testifying that this history did not require a lumbar puncture, Dr. Lustgarten, the plaintiffs’ expert, testified that if Mrs. Hyatt reported that her headaches were the same type that she had been having, there was probably no need for a lumbar puncture. Thus, while there was certainly evidence on which a trier of fact could render judgment in favor of the plaintiffs, there was also evidence that would have supported a finding for the defendant.
Stated differently, absent resolution of the credibility issues, the evidence would have supported a verdict in either direction. Thus, we do not conclude that the jury’s determination was one that could not be reached by a reasonable trier of fact. Rather, a finding for either party required credibility determinations that are prohibited in consideration of a JNOV. Therefore, we conclude that the trial court erroneously substituted its view of the evidence over that of the jury. Accordingly, we reverse the JNOV and reinstate the jury verdict. Due to this finding, we need not review the remainder of the appellants’ assignments of error.
Answer to the Appeal
The plaintiffs answered the appeal asking that in the event the jury’s verdict is reinstated, a new trial be ordered. The plaintiffs contend that the trial court erred on two occasions. First, the plaintiffs contend that the trial court erroneously prohibited one of their experts from testifying as a rebuttal witness. Next, the | ^plaintiffs argue that the trial court erred in refusing to permit Mrs. Hyatt from participating in or attending the trial.

Dr. Roger Kelley

The record reflects that Dr. Raggio closed his case without calling a listed expert witness, Dr. Lisa Snyder, a neurologist. Due to the failure to call Dr. Snyder, the trial court prohibited the plaintiffs from calling a neurologist listed as a rebut *781 tal witness, Dr. Robert Kelley. Following the jury’s verdict, however, the trial court granted the plaintiffs’ motion to supplement the record and permitted Dr.- Kelley’s deposition to be entered into the record.
In their answer to the appeal, the plaintiffs contend that the exclusion of the witness was improper and that even if Dr. Kelley could not be used to rebut the testimony of Dr. Snyder, the only other listed neurologist, Dr. Kelley’s testimony would have been useful in demonstrating the defendant’s experts’ “incongruous reasoning.” After the defendant closed his case, the following colloquy is found in the record:
MR. HAMMONS [Plaintiffs’ Counsel]:'
Your Honor, based upon our discussions earlier, it is my understanding that I would like the record to reflect that we had prepared to call Dr. Robert Kelly [sic], Chief of Neurology at LSU Medical Center. But I understand from our pretrial conference that you have ruled that it would be inappropriate for him to testify on rebuttal since the defense did not call Dr. Lisa Snyder.
THE COURT:
That’s correct.
MR. WEIL [Defendant’s counsel]:
And—
MR. HAMMONS:
I would like the record to reflect my objection to the ruling.
THE COURT:
Certainly.
|14MR. WEIL:
Well, it’s my understanding that— well, that’s fíne. We had — my understanding was we both agreed if I didn’t call Snyder, he wouldn’t call Dr. Kelly [sic].
THE COURT:
Yeah, well—
MR. WEIL:
So, I’d just like to note that.
THE COURT:
— my ruling, gentlemen, that you have an expert, a neurologist, and he had an expert to counter that in rebuttal. If you don’t call yours and he’s not gonna call — then, he can’t call his ‘cause there’s nothing to rebut.’ It seems simple to me really. If you don’t call him, how he’s gonna rebut something?
The above colloquy indicates that an agreement may have existed regarding the calling of witnesses. However, no evidence of such an agreement is contained in the record. Without full knowledge of the proceedings, we are unable to determine whether the trial court abused its discretion in excluding this witness at trial. However, we have reviewed Dr. Kelley’s deposition, which was filed into evidence after the trial court granted the motion to supplement the record and find that Dr. Kelley would have offered essentially the same type of testimony offered by the plaintiffs’ other witnesses. Central to Dr. Kelley’s testimony was his conclusion that Mrs. Hyatt’s presentation on her September 28 visit deserved a more thorough exam. However, he also stated that, if Mrs. Hyatt reported that her headaches were not atypical, Dr. Raggio did nothing wrong. We do not conclude that the record adequately demonstrates that the trial court initially abused its discretion in excluding this witness.
Mrs. Hyatt’s Participation in the Trial
The plaintiffs also contend that the trial court erred in excluding Mrs. Hyatt from participating in the trial or being present in the courtroom. They contend that | ^the court was without a statutory or jurisprudential basis for excluding Mrs. Hyatt, a plaintiff. In their brief to this court, they contend that “[t]he effect of the Trial Court’s ruling was to create an unexplained empty chair which gave Dr. Rag-gio an unfair advantage.”
La.Code Civ.P. art. 1631 provides, in part:
A. The court has the power to require that the proceedings shall be con *782 ducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done.
B. The exclusion of witnesses is governed by Louisiana Code of Evidence Article 615.
La.Code Evid. art. 615 relates to sequestration of witnesses and provides:
A. As a matter of right. On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case. In the interests of justice, the court may exempt any witness from its order of exclusion.
B. Exceptions. This Article does not authorize exclusion of any of the following:
(1) A party who is a natural person.
[[Image here]]
The issue raised in the plaintiffs’ answer is not particularly one of excluding a witness from the courtroom. Rather, we are faced with a situation where the trial court excluded a party from the courtroom. However, this is an atypical situation. Mrs. Hyatt’s treating physician testified that she requires total care in that she cannot walk, talk, or verbalize. He testified that she does not understand language and is neither mentally nor physically capable of testifying.
Our difficulty in ruling on the appropriateness of the trial court’s order is compounded by the fact that the record does not include any motion to exclude Mrs. |1fiHyatt and no ruling from the court. The only basis by which we know that such a ruling exists, other than from the plaintiffs’ assertion in their brief to this court, is a minute entry indicating: “The Court states that the previous motion to exclude the testimony of Mrs. Hyatt still stands.” (Emphasis added.) There is no indication, in the record before us, that Mrs. Hyatt was, in fact, excluded from the courtroom. Thus, we are left with very little on which to base a review. Neither do the plaintiffs direct us to any jurisprudential or statutory authority requiring a trial court to permit the “participation” of a party who is obviously incapable of participating. In light of the unique circumstances of this case and the trial court’s power to control the trial, see La.Code Civ.P. art. 1631(A), we do not find any clear error in the court’s apparent determination.
DECREE
For the foregoing reasons, the trial court’s entry of the judgment notwithstanding the verdict is reversed. Further, we reinstate the judgment signed on April 6, 1998 reflecting the jury’s verdict. All costs of this appeal are assessed to the plaintiffs, Jams and Gary Hyatt.
REVERSED AND RENDERED.
PICKETT, J., dissents.
DECUIR, J., dissents with reasons.

. Nurse Laura Chenevert testified that the notation "AAO” means alert, awake, and oriented.

. Nurse Chenevert explained that "MAE +/=” notes that a patient moves all extremities strongly, equally.

. See Janis Hyatt, et vir v. John Raggio, M.D., 98-1867 (La.App. 3 Cir. 2/2/00); 757 So.2d 783.

. The burden required of a plaintiff seeking to recover in a medical malpractice action against a physician is set forth in La.R.S. 9:2794(A). The statute requires that such a plaintiff prove:
(1)The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.